George Graves **DIXON**, Plaintiff-Appellee,

v.

**PACIFIC MUTUAL LIFE INSURANCE COMPANY**, Defendant-Appellant.

No. 212, Docket 25332.

United States Court of Appeals Second Circuit.

Argued March 10, 1959.

Decided June 19, 1959.

See, also, D.C., 151 F.Supp. 106.

Leon Wasserman, New York City (Norman Meltzer, New York City, on the brief), for plaintiff-appellee.

Henry I. Fillman, New York City (Otto C. Sommerich, Katz & Sommerich, New York City, on the brief), for defendant-appellant.

Before WASHINGTON, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Plaintiff, holder of a non-cancellable income policy of insurance against disability from injury or sickness resulting in loss of business time issued to him by defendant, brought an action in the City Court of the City of New York to recover monthly benefits under the policy alleging total disability by reason of illness to continue his occupation as a surgeon. Because of diversity of citizenship the case was removed to the federal court. Prior to the trial now under review plaintiff was permitted by supplemental complaint to enlarge his claim, originally stated only to include a twelve month period from July 22, 1953 (i. e., $4,800), to cover the entire period up to the date of trial. From a judgment in plaintiff's favor for $24,977.03 upon a jury verdict and upon the court's decision that a release executed by plaintiff was null and void, defendant appeals.

In 1927 defendant issued to plaintiff the disability policy upon which suit is brought. Plaintiff is described therein as "by occupation a Physician and Surgeon." In substance the policy insured against disability resulting from sick-

ness. There was evidence that in 1927 plaintiff was engaged in the practice of general medicine and surgery, but even then tending to specialize in surgery. He also performed obstetrical, gynecological, rectal and prostatic examinations. In 1933 he was admitted to the American College of Surgeons to qualify for which "[i]n Brooklyn at that time it was necessary for 70 per cent of his practice to be surgical and the man should be known as a surgeon in the community" (Pltf.'s testimony, 175a). Since 1941 plaintiff's practice had been exclusively surgery. During the Second World War he was chief of the surgical service in an Army general hospital.

In 1949 plaintiff developed dermatitis of the hands. For about three years he continued to practice except for periods in which the disease would flare up occasioned by necessary surgical sterilization procedures, such as, vigorous scrubbing of the hands, use of soaps and the wearing of rubber gloves. At that time (1949), plaintiff consulted a well-known dermatologist. Again in September 1952, as a result of a further attack, plaintiff consulted another dermatologist and was under constant treatment by him for some nine months. The condition improved when plaintiff did not engage in sterilization techniques but the dermatitis was not cured.

In October 1952 plaintiff gave up his practice and notified defendant that he was unable to attend to it because of his condition. Thereafter he sought other employment. In March 1953 he applied for, and in August 1953 received, an appointment as Chief of Physical Medicine and Rehabilitation at a Veterans Administration Hospital (for mental patients), in Knoxville, Iowa. His dermatitis condition was observed upon his physical examination for that position. In 1956, after a course of training in administrative medicine, plaintiff was assigned to a Veterans Hospital at Fort Harrison, Montana as Director of Professional Services and Administrative Chairman of the Research Committee. The work was somewhat analogous to

that of a hospital superintendent. Although plaintiff was technically practicing medicine in both positions (the positions required a licensed doctor), he did not examine, diagnose or treat patients except for an occasional sprain or bruise.

### The Release

In April 1953, after plaintiff had filed his claim, defendant's Claims Representative raised the question as to whether plaintiff was totally disabled. In May 1953 this representative said he could not recommend payment on the basis of total disability but suggested a settlement. Defendant prepared a release. Plaintiff signed the release and received from defendant $1,411.32.

A substantial controversy exists between the parties as to the validity of the release. Plaintiff claims that he executed the document believing a statement by defendant's Claims Representative that if plaintiff took a position with the Veterans Administration he would be resuming his occupation as a physician and surgeon which would preclude him from receiving further total disability payments. This statement being inaccurate, argues plaintiff, the release was executed under a mistake of fact. Defendant vigorously disputes the making of the representation and contends that, if made, it would be a mistake of law rather than a mistake of fact.

The trial court reserved for itself the decision as to the validity of the release but sought an advisory verdict from the jury upon written questions. Upon the question of validity the court's charge was most comprehensive and fair. Only if the mistake is clearly a mistake of law should this court disturb the jury's advisory verdict in favor of plaintiff and the trial court's decision holding the release void.

The border line between mistakes of law and fact is often very thin. Here particularly so. There are very few mistakes of material facts which do not have legal consequences thus enabling persuasive arguments to be made that the mistake is one of law. Decisions in other cases are not too helpful

in arriving at the correct result because the inducing reasons for signing are different in each case. If plaintiff believed as a matter of fact that he would not receive any further disability payments if he took the Veterans Adminstration position and if defendant did not intend in fact to continue such payments for that reason, a release executed under such circumstances might well come within the equitable doctrine which affords relief when the mistake is material and it determines the conduct of the mistaken parties. The mistake under which the release was signed cannot be viewed as solely one of either fact or law; it related to the appellee's rights and has both factual and legal aspects. "Where there is a mutual mistake as to antecedent private rights, it has been held that the mistake partakes of the nature of a mistake of fact." Fidelity & Deposit Co. of Maryland v. McQuade, 1941, 74 App.D.C. 383, 123 F.2d 337, 339. See also Columbian National Fire Insurance Co. v. Dixie Co-operative Mail Order House, Tex.Com.App.1925, 276 S.W. 219. Even if a mistake of law is inadvertently induced, it may serve as a basis of rescission. Thus an ordinary layman may be justified in relying upon an insurance agent to give a reliable opinion upon problems arising out of the insurance contract. Hudson v. Glens Falls Ins. Co., 1916, 218 N.Y. 133, 112 N.E. 728, L.R.A.1917A, 482. See Restatement, Torts § 545(2), Comment *d* (1938); cf. 5 Williston, Contracts § 1591, at 4438–39 (Rev. ed. 1937).[1] As to the claim that the release was not promptly repudiated, the jury's advisory verdict and the court's decision are not clearly erroneous. Upon all the facts it cannot be said as a matter of law that the release was a bar to plaintiff's claim.

*Plaintiff's Occupation as a Physician and Surgeon*

By simple logic, at first impression most compelling, defendant argues that it insured plaintiff as a physician and surgeon; that plaintiff's positions at the Veterans Hospitals could only have been filled by a licensed physician; and that, therefore, he was still functioning as a physician and hence not totally disabled. Quite frequently, however, cold logic can be most unrealistic. Carried to extremes, it could be asserted that so long as plaintiff retained his license to practice he was not totally disabled.[2] The policy and the word "occupation" cannot be so narrowly construed. Occupation is the occupation of the individual policyholder. It is the ability to continue in his particular occupation for which he seeks protection by insurance. If his occupation has become that of a recognized specialist in surgery and he suffers from a physical impairment or disease which causes an uncontrollable tremor of the hands or an infection, such as dermatitis, resulting in the forced discontinuance of his practice for all practical purposes there is total disability. He can no longer pursue his real occupation. Against this possibility he may seek insurance protection.

Over the last several decades there has been an increasing tendency in the field of medicine to specialize. Even in surgery there are many fields. If a physician has spent his life as a neurosurgeon or an opthalmic surgeon he is effectively deprived of his occupation if illness prevents his continuing in that particular field. Technically he is still a physician and theoretically an insurance company could argue that an affliction which would disqualify him from surgery would not prevent him even at

1. For a general discussion of the law of mistake see Pomeroy's Equity Jurisprudence (Fifth Edition), sections 841 and 847–850.

2. Defendant's Claims Representative, when questioned by the court, conceded that plaintiff would be entitled to disability payments if he were unable to perform the essential functions of a physician and surgeon and became the manager of a hospital (Appellee's Appendix pp. 246a–247a).

advanced years from becoming a general practitioner.

■ Defendant amassed much evidence tending to prove that the qualifications for plaintiff's Veteran Hospital positions called for a physician. The trial court admitted this evidence and permitted the jury to decide whether plaintiff was able to pursue the occupation of "Physician and Surgeon" as defined in the policy. The trial court instructed the jury that the policy was "to be construed by giving such meaning to the terms used as would be ascribed to them by the average man in applying for the insurance and reading the language of the policy at the time it was written"; that they were not to revise the policy or increase defendant's risk; and that they were to decide "whether the plaintiff and defendant intended that the type of work to be covered by this policy included the work plaintiff has been doing in the Veterans Administration hospitals." The jury's answers to the court's written questions were amply sustained by the evidence and there was no error in denying defendant's motions to dismiss or for judgment notwithstanding the verdict.

The two Arkansas cases construing the same type of policy issued by defendant do not require the setting aside of the jury's verdict. In Aetna Life Ins. Co. v. Orr (Pacific Mutual Life Ins. Co. v. Orr), 1943, 205 Ark. 566, 169 S.W. 2d 651, the doctor practiced both as a physician and surgeon. His practice as a physician continued in substantial volume. The error was in the court's charge in the light of the particular facts. Franklin Life Ins. Co. v. Burgess, 1952, 219 Ark. 834, 245 S.W.2d 210, merely recognized the theory of "dual professions" as stated in the Orr case.

*Alleged Failure to Comply With Policy*

■ Paragraph 21 of the policy provided that the insurance did not cover "(1) any disability for which the Insured is not necessarily and regularly attended by a legally qualified physician other than the Insured;". Waiver of this requirement was provided for if "attendance is declared by medical authority satisfactory to the Company to be unnecessary;". Defendant points to proof that plaintiff did not consult, nor was he treated by, any dermatologist either in Knoxville, Iowa or Fort Harrison, Montana and that an expert witness had said that he was not incurable. From this proof defendant argues that plaintiff failed to comply with the terms of the policy. Although the statements in some of the opinions relied upon seem to support defendant's position, as is usually the case, the facts are sufficiently different so as to render them inapplicable. In Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, the insured refused to undergo treatment for syphilis; in Mutual Ben. Health & Accident Ass'n v. Cohen, 8 Cir., 1952, 194 F.2d 232, 234, certiorari denied 343 U.S. 965, 72 S.Ct. 1059, 96 L.Ed. 1362, the policy required regular attendance "at least once a week"; and in Mutual Life Insurance Co. of New York v. Ellison, 5 Cir., 1955, 223 F.2d 686, certiorari denied 350 U. S. 845, 76 S.Ct. 86, 100 L.Ed. 752, although the facts of the case were most similar, namely, the specialty, surgery and the illness, dermatitis of the hands, the appellate court found that the doctor had completely failed to take any adequate steps to be cured. Here, on the contrary, plaintiff consulted two specialists in dermatology and followed their prescribed course of treatment. Over a period of three years the disease persisted, quieting down when surgery and necessary preparations therefor were avoided and flaring up when they were practiced. The policy uses the words "necessarily and regularly attended." Surely regular attendance for the rest of plaintiff's life would not be necessary if an honest attempt to cure the infection resulted in convincing failure so that continuance of medical consultation would be productive of no beneficial results as far as any return to surgery was concerned.

*Other Insurance*

Defendant argues that because of other insurance its liability to plaintiff must be on a pro rata basis. However, the other insurance was disclosed by plaintiff in his statement of sickness diability in November 1952. Thereafter plaintiff paid full premiums on defendant's policy, no part of which was returned as provided for in the policy. Furthermore, the terms of the other policies were different.

*The Supplemental Complaint*

The supplemental complaint merely sought damages up to the date of trial; not in the future. The amendment allowed by pretrial order pursuant to Federal Rule of Civil Procedure 15(d), 28 U.S.C.A., was proper.

The judgment is affirmed.