**Nachman BLASBALG, Plaintiff,**

v.

**MASSACHUSETTS CASUALTY INSURANCE COMPANY, Defendant.**

No. 93–CV–5792 (FB).

United States District Court, E.D. New York.

April 28, 1997.

Michael S. Frankel, New York City, for Plaintiff.

Michael J. Zaretsky, Chorpenning, Good, Carlet & Garrison, New York City, for Defendant.

### MEMORANDUM & ORDER

BLOCK, District Judge:

Plaintiff Nachman Blasbalg ("Blasbalg") has brought a claim for benefits under the disability policy (the "Policy") issued to him by defendant Massachusetts Casualty Insurance Company ("MCIC"). The case was tried before the Court without a jury on January 13 and 22, 1997. The Court concludes that Blasbalg has been "totally disabled," as defined by the terms of the Policy, since October 1, 1991, and is therefore entitled to the Policy's benefits. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the following are the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

1. On April 1, 1986, MCIC issued Disability Income Policy 0297059 to Blasbalg. On June 15, 1992, Blasbalg filed a notice of claim with MCIC, seeking disability benefits under the Policy from October 1, 1991 forward. MCIC denied the claim, which precipitated the present litigation, initiated by Blasbalg in 1993.

2. The Policy provides for the monthly payment of five thousand dollars ($5,000) during the period of a continuous total disability if the onset of that disability occurred prior to the insured's 60th birthday.

3. Blasbalg, who is presently 50 years old, was born on December 5, 1946.

4. The Policy defines "total disability" as follows:

The term "total disability" shall mean your substantial inability to perform the material duties of your work due to injury or sickness. Work means: (1) your regular occupation, trade, or profession; and (2) as such exists at the start of any period of

disability for which a claim for benefits is made under this policy.

5. After college, Blasbalg took courses in computer programming, with a focus on the COBOL language. Following the completion of these computer programming courses, Blasbalg's first three jobs were all computer programming positions.

6. In 1984, Blasbalg was hired by Mademoiselle Knitwear, Inc. ("Mademoiselle"), a large manufacturer of sweaters and knit fabrics, to computerize its business operations. In 1985, he became a full-time employee and worked for Mademoiselle until the beginning of October 1991. During the last year of his employment he was Vice President of Data Processing.

7. During his employment at Mademoiselle, Blasbalg was in charge of the design, implementation, writing and maintenance of all of its computer programs. In total, he oversaw the writing of between 500–600 computer programs. Blasbalg wrote a majority of those programs, and knew the codes of the majority of the remainder.

8. Blasbalg's work for Mademoiselle typically required him to spend three-quarters of the day in front of a computer screen programming, coding, debugging and ensuring the correctness of the underlying data. These duties required a substantial amount of scrolling and the intensive use of his eyes. The balance of his time was spent on other computer-related activities, such as bar coding.

9. During the summer of 1991, Blasbalg started to suffer from headaches due to eye strain, and his normal workday productivity decreased by fifty percent. This loss of productivity precipitated complaints by his employer and resulted in the termination of his employment with Mademoiselle in the fall of 1991.

10. MCIC did not adduce any testimony from anyone associated with Mademoiselle or put forth any evidence to contravene Blasbalg's uncontroverted testimony that his termination of employment with Mademoiselle was due solely to his physical inability to continue to perform his normal work duties because of his eye strain and headaches.

Nor did MCIC contest Blasbalg's testimony that he never had these problems before and that his work with Mademoiselle prior thereto was problem free.

11. On October 7, 1991, at or about the time of the termination of his employment, Blasbalg consulted Dr. Simcha Ben–David, a board-certified ophthalmologist affiliated with Maimonides Medical Center in Brooklyn, and New York Eye and Ear and Beth Israel, both of which are located in Manhattan. Dr. Ben–David had examined Blasbalg once before, for a routine checkup, in August 1986. As of 1986, although Blasbalg's vision was within normal limits (20/20 and 20/25), Dr. Ben–David noted that Blasbalg had a small linear scar on the right cornea, which did not apparently cause him any vision problems at that time.

12. At the October 7, 1991 examination, Blasbalg complained of blurred vision in his right eye and continual headaches from eye strain. Dr. Ben–David's examination revealed that in addition to the linear scar diagnosed in 1986, Blasbalg now had "a central ark like linear haze that was concentric to the bottom part of the eye." It was "very much" in his field of vision and was "as if a person would use their fingernail to scratch their eye, but this happens spontaneously."

13. On November 1, 1991, Blasbalg returned to Dr. Ben–David on an emergency basis complaining of a protracted three-day period of continuous blurred vision in the right eye. Dr. Ben–David sent Blasbalg to a corneal specialist, Dr. Robert Cykiert, who examined him on November 7, 1991. He essentially agreed with Dr. Ben–David's findings. As Dr. Ben–David explained: "[B]ottom line is that we were both talking about an irregularity of the right eye in the center of the cornea," which would cause the left eye to compensate for the injury to the cornea and would result in headaches.

14. As Dr. Ben–David opined in a letter he wrote to MCIC on September 22, 1992:

The above patient first visited me in [the] beginning of October 1991, complaining of blurred vision and continual headaches from eye strain. He indicated that these symptoms were occurring since approxi-

mately June 1991. Being that his profession as a systems analyst requires continual work at a computer monitor, plus the reading of computer reports, he claimed that the blurred vision was hurting productivity and endangering his job.

After close examination, I recognized the problem as a corneal dystrophy of the right eye. The location of the dystrophy in the cornea is central, thereby causing the blurred eyesight. Additionally, the fact that he is right eye dominant creates a situation, wherein the left eye has to continually adjust and compensate for the right eye, thus causing the headaches that the patient was complaining of.

There is no treatment available to completely cure this condition. . . .

I have seen the patient three times since and also referred him to a corneal specialist, Dr. Robert Cykiert, who concurred with my observation. . . .

15. Blasbalg's eye problems and headaches persisted throughout the ensuing years. Dr. Ben–David last examined him on November 21, 1996. As he testified in his deposition, in evidence, Dr. Ben–David did not believe that Blasbalg's condition had improved since his 1992 report, and that "[a]nything more than minimal reading, writing would be difficult for him." Furthermore, "it would be worse on a computer screen because of the fact that it's continuously changing, and more so on the computer you have what we call virtual images. A computer is more difficult than just plain reading."

16. During the November 21, 1996 examination, Dr. Ben–David observed that Blasbalg had developed blurred vision and fluctuating eyesight in his left eye.

17. Dr. Ben–David further testified that an invasive debridement procedure could possibly be undertaken. "Sometimes it works. Sometimes, it doesn't." In any event, in Dr. Ben–David's opinion, it is "very painful," and there would be a substantial risk of infection, with severe consequences. Dr. Ben–David did not recommend that Blasbalg undergo this surgery.

18. Blasbalg was examined by defendant's expert, Dr. Ira Udell, on June 9, 1995.

Dr. Udell essentially concurred with Dr. Ben–David's diagnosis, describing Blasbalg's eye condition as "a basement membrane dystrophic epithelial type change of the right cornea in the area overlying the visual axis." As he testified in his deposition, in evidence, this condition causes blurry vision and "[c]ould cause . . . fluctuating eyesight minute to minute" on an hourly and daily basis, as well as headaches. He chose not to comment on the effect all this would have on the job demands of a computer programmer "because [he] didn't have any personal experience with individuals who have gone through that." This was in contrast to Dr. Ben–David, who testified that "I deal with patients who work on computers hours long and who come in complaining of the fact— complaining of their eyes hurting, 'their vision going on me.'"

19. During his last two years at Mademoiselle, Blasbalg earned in the range of $70,000 per annum. After he left Mademoiselle he earned some small amount of income during the remainder of 1991 and through 1992 as an independent business consultant. His 1992 income tax return reflects $7,038 in miscellaneous business income.

20. During 1993 Blasbalg worked as an independent contractor/consultant for International Gemological Institute, Inc. ("IGI"), where he designed, modified and created a computerized bar coding system. This basically involved reading and writing; bar coding does not require computer programming, except for a small amount of computer programing used to install the bar coding system into an existing program. His earnings from IGI in 1993 amounted to $13,937, which constituted the major portion of his income for that year.

21. From 1994 through July 1995 Blasbalg acted, first as an independent consultant, and then as a permanent employee, for a nursing home, Gericare Systems, Inc. ("GSI"). His primary responsibility was to create, implement and monitor an internal bar coding system. He also created design specifications for computer programs, redesigned GSI's work place and flow methods, and authored and created a newsletter on a word processor. Blasbalg earned $58,726 in

1994, $30,000 of which came from GSI; the remainder being derived from miscellaneous income as a business consultant. He earned $42,000 from GSI in 1995, until he was let go in July of that year.

22. In 1995 and 199ᵥ Blasbalg worked as an independent consultant for Kings Harbor Care Center ("KHCC"). He performed an analysis and efficiency study of KHCC's departments, created written reports, and modified and enhanced its computer programs. Blasbalg also trained the KHCC staff in the utilization of KHCC's computer programs, developed Lotus spreadsheets, and coded macros on the computer. As reported on his federal income tax return, Blasbalg's total income in 1995 from GSI, KHCC, and another, incidental business source, was $57,531.15.

23. While the bar coding which Blasbalg effected at IGI and GSI entailed imputing "source codes" (lines of instructions) into a computer, as well as modifying existing programs and enhancing and expanding program functions, all of which did involve sitting at a computer screen, Blasbalg's bar coding duties were unlike the bulk of the computer work he did for Mademoiselle since it consisted primarily of word processing and did not involve significant scrolling and scanning on the computer screen. The same was true for the Lotus spreadsheets Blasbalg prepared for KHCC.

24. In essence, Blasbalg believes he is entitled to the disputed disability payments because since he left Mademoiselle he is either relegated to doing computer work at home or, when employed, limited to work that does not entail significant scrolling or other eye-intensive functions. As he explained in response to the Court's questioning:

[BLASBALG]: Working full time as a computer programmer, you are using your eyes continually on a high-intensity level. All this work that I have done, when you use a word processor, it is a very low-intensity level. And the same for a Lotus program: there is no, really, movement. Screens: you are dealing with one fixed screen at a time.

THE COURT: In other words, basically the difference is, you are dealing with a fixed screen as compared to a machine that's jumping all over the place.

[BLASBALG]: Where you are forced to scroll from here to there.

THE COURT: Would you say that's the fundamental difference that impacts upon the use of your eyes and the headaches you get and the physical problems you get?

[BLASBALG]: That plus one other factor: the pacing of myself. When I work for myself, I work at my pace. There is nobody to say, if I decide that I want to lay down now or want to close my eyes for a half hour, there's nobody there to say you can't do that. So I end up doing a day's worth of work over four or five days and there is nobody there to tell me.

THE COURT: It is easier to control the use of your eyes, regardless of what the type of work is—

[BLASBALG]: Correct.

THE COURT: —when you are doing it in the luxury and the comfort level of your home as compared to the workplace. That's one major factor. And the other is the factor that when you use a computer, it is a high intensive use of your eyes because the machine is scrolling back and forth. Is that basically what you are talking about here?

[BLASBALG]: That's exactly it. Exactly.

## CONCLUSIONS OF LAW

"Disability insurance policies generally fall into two classes: occupational insurance, which provides coverage if the insured is unable to pursue the particular occupation in which he was previously engaged; and general insurance, which provides coverage only if the insured is unable to pursue any occupation." *Dawes v. First Unum Life Ins. Co.*, 851 F.Supp. 118, 121–22 (S.D.N.Y.1994) (citing Couch on Insurance 2d § 53.45 (1983)). There is no dispute that the Policy falls into the first category. It provides that Blasbalg is eligible for benefits if he is "totally disabled," which is defined in the Policy as the "substantial inability to perform the material duties of your work due to Injury or Sickness." The Policy defines "work" as "(1) your regular occupation, trade or profession;

and (2) as such exists at the start of any period of disability for which a claim for benefits is made under this Policy." The onset of Blasbalg's disability occurred during his last year at Mademoiselle when he was Vice President of Data Processing in charge of the design, implementation, writing and maintenance of all of its computer programs.

The Policy provides no definition of the term "regular occupation." MCIC urges the Court to construe "regular occupation" broadly as including not just computer programming, but also a variety of tasks related to Blasbalg's computer activities at Mademoiselle, such as bar coding. Blasbalg, on the other hand, argues that the facts adduced at trial support a determination that his regular occupation was computer programmer, an occupation which required the extensive and intensive use of his eyes for several hours every workday.

There is a considerable dearth of judicial authority on the meaning of the term "regular occupation" in occupational disability policies. Because federal jurisdiction is, as here, invariably invoked by reason of diversity and these cases are normally relegated to the state forum, the Second Circuit has apparently had just one occasion to give content to the concept of "occupation" in the context of this type of insurance policy. In *Dixon v. Pacific Mutual Life Ins. Co.*, 268 F.2d 812 (2d Cir.1959), the plaintiff was specifically described in the policy as "by occupation a Physician and Surgeon." His practice was exclusively as a surgeon when he developed dermatitis of the hands, which required him to give up his practice a few years later and move into an administrative position as Chief of Physical Medicine and Rehabilitation at a Veterans Administration hospital, a position which could only be filled by a licensed physician. In rejecting the insurance company's contention that plaintiff could not recover under his disability policy because he was still a physician, the court prescinded between his general occupation as a physician and his "real occupation" as a recognized specialist in surgery:

> Over the last several decades there has been an increasing tendency in the field of medicine to specialize. Even in surgery

there are many fields. If a physician has spent his life as a neurosurgeon or an ophthalmic surgeon he is effectively deprived of his occupation if illness prevents his continuing in that particular field. Technically he is still a physician and theoretically an insurance company could argue that an affliction which would disqualify him from surgery would not prevent him even at advanced years from becoming a general practitioner.

*Id.* at 815–16.

Accordingly, the court abjured a narrow construction of "occupation," noting that "cold logic can be most unrealistic," and opted to give credence to plaintiff's "particular occupation" as a surgeon rather than his general calling as a physician. *Id.* at 815. The court, however, in this diversity case, did not draw upon or cite to any New York authority for its holding nor attempt to give any general guidance as to how one should discern a plaintiff's "particular occupation." Recently, Judge Wood in *Dawes*, citing to *Dixon* and one New York State case, *Niccoli v. Monarch Life Ins. Co.*, 70 Misc.2d 147, 332 N.Y.S.2d 803 (Sup.Ct. Kings Co.1972), *aff'd*, 45 A.D.2d 737, 356 N.Y.S.2d 677 (2d Dep't 1974), *aff'd*, 36 N.Y.2d 892, 372 N.Y.S.2d 645, 334 N.E.2d 594 (1975), tried her hand at defining the term "regular occupation" in occupational disability policies under New York law. Notwithstanding *Dixon*'s focus on one's "particular occupation," Judge Wood opined that "regular occupation ... is not limited to the insured's particular job," *Dawes*, 851 F.Supp. at 122, and offered the following original definition: "[A] position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Id.*

In *Niccoli*, which, like *Dixon*, also entailed a physician/surgeon occupational disability policy scenario, the courts would not preclude recovery for a doctor who had to relinquish his obstetrics/gynecology practice as a result of a heart attack simply because he was able to use the skills and knowledge which he possessed as a physician and surgeon in his subsequent employment as a hospital director of family planning and sex

education. While the lower court's decision did not identify or promulgate any particular definition of "regular occupation," it relied upon *Dixon* in concluding that "a physician's disability policy is broad enough to encompass the physician's specialty." 70 Misc.2d at 151, 332 N.Y.S.2d 803. In addition, it articulated the following governing principles:

■ (1) Where "total disability" means, as in the present case, the "substantial inability to perform the material duties of [the policyholder's] work," this does not mean that the insured cannot perform some of the acts required in the conduct of a business or occupation or that he cannot make maximum use of the skills acquired in his former calling. Rather, the focus is on whether the insured can continue to perform "in the usual and customary way." *Id.* at 150, 332 N.Y.S.2d 803.

■ (2) Disability policies are to be given practical application, consistent with New York's declared policy that "the terms of an insurance policy will receive the construction most favorable to the insured." *Id.* at 149, 332 N.Y.S.2d 803; *see also Monarch Life Ins. Co. v. Brown,* 125 A.D.2d 75, 81, 512 N.Y.S.2d 99 (1st Dep't 1987) ("A policy which is subject to more than one reasonable interpretation must be interpreted to resolve ambiguity against the insurer and in favor of the policyholder."); *Village of Sylvan v. Travelers Indem. Co.,* 55 F.3d 114, 115 (2d Cir.1995). Accordingly, even in those cases, unlike the present case, where the policy precludes recovery if the policyholder can perform "any" of the duties of his profession or occupation, a "reasonable interpretation" is required. *Niccoli,* 70 Misc.2d at 150, 332 N.Y.S.2d 803 (citing *McGrail v. Equitable Life Assur. Soc.,* 292 N.Y. 419, 425, 55

N.E.2d 483, 486–87 (1944) (policy provided benefits if insured was prevented from performing "any and every duty pertaining to his occupation")). *Cf. Taterka v. Nationwide Mut. Ins. Co.,* 91 A.D.2d 568, 457 N.Y.S.2d 53 (1st Dep't 1982) (barring recovery for ophthalmologist because he was able to perform some duties of his prior occupation under an "any and every duty" clause); *Matza v. Empire State Mut. Life Ins. Co.,* 50 A.D.2d 554, 375 N.Y.S.2d 578 (1st Dep't 1975) (granting benefits under "each and every duty" clause for executive who lost his ability to speak).

■ (3) Since occupational disability policies are designed to indemnify against loss of capacity to work, not against loss of income, recovery will not, therefore, be precluded even if plaintiff were to earn a larger income from his new occupation.

■ The lower court's holding and rationale in *Niccoli* was not countermanded by the appellate courts on appeal,[1] and has been relied upon by federal courts as the appropriate articulation of New York law. *See, e.g., Brumer v. National Life of Vermont,* 874 F.Supp. 60, 64 (E.D.N.Y.1995); *George v. First Unum Life Ins. Co.,* 1996 WL 701018, at *2 (S.D.N.Y.). Application of these broad-based principles and the Second Circuit's recognition in *Dixon,* reinforced in *Niccoli,* of the concept of specialization within a given occupational or professional calling informs the Court's conclusion, based on its findings of fact, that Blasbalg should recover on his disability policy.

At the onset of his disability Blasbalg, in his titular capacity as Vice President of Data Processing, was, and for a number of years had been, his company's computer

---

1. On the merits, a majority of the Appellate Division affirmed without opinion. In dissent, Justice Benjamin, relying on *McGrail,* believed that plaintiff was able to perform a substantial part of his duties as a physician, even considering his specialty. The Court of Appeals unanimously affirmed, ruling that since the issue of fact as to whether plaintiff's disability satisfied the policy standard defining 'total disability' as the 'complete inability of the insured to engage in his regular occupation' was decided against the defendant and affirmed by the Appellate Division, review was barred under New York Civil Practice Law and Rules § 5501(b). *Niccoli v. Monarch Life Ins. Co.,* 36 N.Y.2d 892, 372 N.Y.S.2d 645, 334 N.E.2d 594 (1975). It commented, however, that the carrier's reliance on *McGrail* was of no avail since even under the more restrictive clause in that policy, the Court of Appeals held in *McGrail,* as recognized by the lower court in *Niccoli,* "that the clause must be read reasonably." *Id.*

programmer.[2] Given the requisite favored construction for the insured, it is reasonable to conclude that in this era of escalating, heightened technology, computer programming is a specialized branch of the computer world requiring special skills and training. Indeed, "[i]t is now well-established under the amended 1976 [Copyright] Act that a computer program is a 'work of authorship' and is subject to copyright protection. Under the Act, computer programs are classified as 'literary works.' ... Case law under the Act also clearly establishes that copyright protection extends to both a program's source code, written in conventional human language and symbols, and object code, written in machine readable binary language." *Digital Communications Assocs., Inc. v. Softklone Distrib. Corp.,* 659 F.Supp. 449, 454 (N.D.Ga.1987) (citing *Whelan, Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1234 (3d Cir.1986)); *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 702 (2d Cir.1992). Clearly, the rapidly increasing role computers play in the workplace has brought with it a significant rise in the number of computer-related occupations. *See generally* U.S. Dep't of Labor, Dictionary of Occupational Titles 43–46 (4th ed. rev. 1991) (listing eighteen "computer related occupations," including seven within the computer programming field). The explosive growth and specialization in the computer industry in the 1990s mirror the specialization trend in the medical field observed in 1959 by the *Dixon* court.

The hazards of working with computers on an intensive basis have manifested themselves in a variety of disabilities with which courts are now grappling. *See, e.g., In re Repetitive Stress Injury Litigation,* 11 F.3d 368, 371 (2d Cir.1993) ("so called 'repetitive stress injuries' include 'carpal tunnel' syndrome, ... de Quervain's disease, Raynaud's Syndrome, synovitis, stenosing tenosynovitis crepitans, tendinitis, tenosynovitis, and epicondylitis...."). It is no wonder that those who make their living in front of a computer screen would covet disability insurance protection.

Having credited Blasbalg's testimony that the customary and usual duties of a computer programmer require the constant, intensive use of the eyes because of the need for a substantial amount of scrolling and scanning while programming, coding, debugging and ensuring the correctness of the underlying data, the Court concludes that Blasbalg's legitimate, serious ocular limitations warrant his entitlement to the benefits of his disability policy.

In so holding, the Court has also credited Blasbalg's testimony that the work he engaged in after terminating his career as a computer programmer did not involve the comparable, intensive use of his eyes. Rather, in creating bar coding systems, developing Lotus spreadsheets and, in general, acting as a consultant, all of which basically required simple word processing, Blasbalg wisely and commendably used the computer knowledge he had acquired to try to earn a living. This does not equate to an ability to return to his specialized calling as a computer programmer. *See Niccoli,* 70 Misc.2d at 152, 332 N.Y.S.2d 803 ("This court will not give a strained interpretation to the contract ... because [the claimant] has used some of his acquired knowledge ... in his new occupation.").

■ Nor is Blasbalg's entitlement to his disability benefits dependent on the availability of possible corrective surgery. As explained by Dr. Ben–David, the suggested

**2.** On his application for disability insurance, dated March 4, 1986, Blasbalg listed his occupation as "Comptroller V.P.," and in the space for "[f]ull and exact duties" Blasbalg wrote "EDP Consultant." Nevertheless, nothing in the Policy states that the occupation listed on the application determines Blasbalg's regular occupation for purposes of disability benefits. Since the Policy defines "work" as Blasbalg's regular occupation *"as such exists at the start of any period of disability* for which a claim for benefits is made under this Policy" (emphasis added), Blasbalg's occupation must be determined as of October 1, 1991, not when the application was submitted in 1986. MCIC does not contend that Blasbalg should be bound by his occupational description in the application. Indeed, it would have been a simple matter for MCIC to state in the Policy that the insured is bound by the occupation stated in the application. Furthermore, MCIC makes no claim of fraud or misrepresentation.

procedure would be very painful, would risk infection, and has an unimpressive rate of success. Neither the Policy nor common sense require that Blasbalg undergo these surgical imponderables. *Cf. Finkelstein v. Metropolitan Life Ins. Co.*, 152 Misc. 439, 273 N.Y.S. 629 (1st Dep't 1934) (insured not entitled to benefits where prerequisite to policy payment was total and permanent disability, and doctor advised insured to undergo hernia operation to alleviate disability); *Papas v. Equitable Assur. Soc.*, 266 A.D. 982, 44 N.Y.S.2d 389 (2d Dep't 1942) (reversing judgment for insured under total and permanent disability policy where harmless drug treatment would have alleviated disability).

Having determined that Blasbalg has been "totally disabled" since October 1, 1991 under the terms of the Policy issued by MCIC,[3] judgment will be entered to that effect. The Court will, however, retain jurisdiction to determine, if necessary, the monies Blasbalg is entitled to receive from the date of disability to the date of this judgment.

**SO ORDERED.**

---

**3.** As noted in Findings of Fact 15 and 16, Blasbalg was last examined by Dr. Ben–David on November 21, 1996. *His condition had not improved throughout the prior five years.* Moreover, Dr. Ben–David observed at that time that Blasbalg had developed blurred vision and fluctuating eyesight in his left eye. There is no indication that his eye conditions have changed since November 21, 1996, and MCIC does not contend otherwise.