Martin A. YAHIRO

v.

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY.

CIV. A. No. WMN–99–1621.

United States District Court,
D. Maryland.

Feb. 6, 2001.

John B. Sinclair, Crosswhite, McKenna, Limbrick & Sinclair, LLP, Baltimore, MD, Jennifer J. Coyne, Miles and Stockbridge PC, Towson, MD, for plaintiff.

David A. Carter, Meyers, Billingsley, Rodbell & Rosenbaum, P.A., Annapolis, MD, for defendant.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court are cross motions for summary judgment. Paper Nos. 20 (Plaintiff's Motion for Partial Summary Judgment) and 22 (Defendant's Motion for Summary Judgment). The motions are ripe for decision. Upon a review of the motions and the applicable case law, the Court determines that no hearing is necessary and that Defendant's motion will be granted.[1]

## I. FACTUAL BACKGROUND

This case arises out of a dispute between Plaintiff Martin Yahiro, a board certified orthopaedic surgeon, and Defendant Northwestern Mutual Life Insurance Company over Plaintiff's entitlement to disability payments under three occupational policies issued to Plaintiff by Defendant. Plaintiff suffers from repeated and debilitating episodes of lightheadedness, diaphoresis, nausea, and vomiting that render him unable to safely perform surgery. While Defendant has made, and continues to make, partial disability payments under the policies, Plaintiff has filed this action seeking payments for total disability. The relevant facts are as follows.

Plaintiff began practicing orthopaedic surgery sometime around 1989. Beginning in June of 1995, Plaintiff was employed with the Greater Chesapeake Orthopaedic Associates, LLC [GCOA]. While working at GCOA, Plaintiff treated patients both surgically and non-surgically. In his initial request for disability benefits, Plaintiff described his principal duties prior to his disability as follows: "office based practice, care of patients in office—65% of time; hospital-based, care of in-patients, 10% of time; surgery, operative care of patients, 25% of time." Def. Exh. 9, Plaintiff's Request for Disability Payments, January 20, 1997.

Although Plaintiff has suffered from the "episodes" of which he now complains for most of his career as an orthopaedist, it was not until January 1997 that he ceased performing surgeries.[2] Once he could no longer perform surgery, Plaintiff continued in a "non-surgical office-based orthopedic practice" for over two years which included seeing non-operative referrals from the emergency room and patients that did not wish to wait as long as would be required to see other doctors in his practice. See

---

1. Also pending are motions filed by both parties to file exhibits under seal. Paper Nos. 19 and 23. Both motions relate to portions of Defendant's Disability Guidelines which Defendant considers as proprietary information. For good cause shown, the motions will be granted.

2. Plaintiff claims that it was a voluntary decision on his part to stop operating. Defendant notes that Plaintiff was told to stop operating by Leslie Matthews, the Chief of Orthopaedic Surgery at Union Memorial Hospital. Regardless of the reason or manner in which the decision was made, there is no dispute that Plaintiff is unable to continue to operate.

Def. Exh. 10,[3] Def. Exh 1, Plaintiff's Deposition, at 179–197. Although there is considerable dispute as to the amount of economic contribution Plaintiff was able to make to GCOA after he stopped operating, it is clear that he continued to generate significant income for the practice. *See* Def. Exh. 14. After March 1, 1997, Plaintiff salary was reduced to $30,000 per year.

While employed with GCOA, Plaintiff was also a member of the faculty for the orthopaedic residency program at Union Memorial Hospital with regular teaching and administrative responsibilities. As a member of the faculty, Plaintiff was "expected to participate in resident teaching conferences, x-ray rounds with residents in the emergency room during the weeks that [he was] on call, to attend in resident clinics and to assist the resident's in surgery when indicated." Pl. Exh. 30. After January 1997, Plaintiff continued teaching but the allocation of his time was shifted to more clinical and non-surgical matters. His salary for the teaching position actually increased, from $28,000 to $36,000. Thus, Plaintiff's combined salary in 1998 from his positions with GCOA and Union Memorial was about $65,000.

Plaintiff resigned from his positions at GCOA and Union Memorial in March of 1999 and took a full time position at the United States Food and Drug Administration, where he had been employed prior to coming to GCOA. Although Plaintiff speculates that he would have been terminated had he not resigned, there is no evidence that Plaintiff was forced, or even asked to resign.

Plaintiff had three disability policies with Defendant. The first two policies, D 485 359 and D1 024 436, with issue dates of August 30, 1986, and January 21, 1994, respectively, contain the following provisions, in relevant part:

**Total Disability**.... [T]he Insured is totally disabled when he is unable to perform the principal duties of his occupation.

**Partial Disability.** The Insured is partially disabled when:

a. he is unable:

— to perform one or more of the principal duties of his occupation; or

— to spend as much time at his occupation as he did before the disability started; and

b. he has at least a 20% Loss of Earned Income.

**Occupation.** The words "his occupation" mean the occupation of the Insured at the time he becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the insured at the time he becomes disabled will be combined together to be "his occupation."

The third policy, D1 156 861, contains similar terms:

**Total Disability**.... [T]he Insured is totally disabled when he is unable to perform the principal duties of his occupation.

If the Insured can perform one or more of the principal duties of the regular occupation, the Insured is not totally disabled; however, the Insured may qualify as partially disabled.

**Partial Disability.** The Insured is partially disabled when:

a. The Insured is unable:

— to perform one or more but not all of the principal duties of the regular occupation; or

---

**3.** Defendant's Exhibit 10 is a letter from Defendant to Leslie Matthews, requesting information concerning Plaintiff's disability. Included in the exhibit are Matthew's handwritten responses.

— to spend as much time at the regular occupation as before the disability started; and

b. the Insured has at least a 20% Loss of Earned Income; and

c. the Insured is gainfully employed in an occupation.

**Regular Occupation.**

The words "regular occupation" mean the occupation of the Insured at the time the Insured becomes disabled. If the Insured is regularly engaged in more than one occupation, all of the occupations of the Insured at the time the disability starts will be combined together to be "the regular occupation."

If the insured is exclusively engaged in:

— a medical or dental specialty of which board certification is available; or

— the specialty of trial law that specialty is the "regular occupation."

Plaintiff's argument for summary judgment is straightforward. Because the terms "occupation" and "principal duties" are not defined in any of the policies, they are to be given their "common man" or dictionary definitions. Plaintiff argues that "the average layperson would agree that the principal duty of an orthopaedic surgeon is surgery." Plaintiff's Reply at 12. As Plaintiff is no longer able to operate, "Northwestern therefore loses." *Id.*

Defendant counters that while surgery is undeniably one principal duty of an orthopaedist, it is not the only principal duty. Because Plaintiff can still perform many of those other duties, Defendant argues that Plaintiff is partially, but not totally disabled and it is, therefore, entitled to summary judgment.

Both sides have moved for summary judgment on the issue of liability.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party is entitled to have "all reasonable inferences ... drawn in its respective favor." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1129 (4th Cir.1987). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## III. DISCUSSION

■ Under Maryland law, unlike the law in some other jurisdictions, there is no rule that an insurance contract is to be construed most strongly against the insurer. Rather, the interpretation of an insurance policy is guided by the same principles that apply to the construction of any other contract. *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021 (1993). As in any contract, words and phrases are to be accorded "their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Kendall v. Nationwide Ins. Co.,* 348 Md. 157, 166, 702 A.2d 767 (1997). Only where there is an ambiguity in a policy is the contract to be construed in favor of the insurer as the drafter of the instrument. *North River Ins. Co. v. Mayor & City Council of Balto.,* 343 Md. 34, 40, 680 A.2d 480 (1996). Furthermore, the insurance contract must be "viewed as a whole, without emphasis being placed on particular

provisions. Moreover, whenever possible, each clause, sentence, or provision shall be given force and effect." *Empire Fire and Marine Company v. Liberty Mut. Ins. Co.,* 117 Md.App. 72, 96, 699 A.2d 482 (1997) (citations omitted).

■ There is much that is not disputed about the contracts at issue. Defendant concedes that the policies are "own occupation" or "occupational policies," as opposed to "general disability" policies. Occupational policies indemnify the insured when he becomes disabled from performing the material acts necessary to his chosen profession, whereas, general disability policies indemnify the insured only when he becomes incapable of following any occupation for profit. *See Niccoli v. Monarch Life Insurance Co.,* 70 Misc.2d 147, 332 N.Y.S.2d 803, 805 (N.Y.S.Ct.1972), *aff'd,* 45 A.D.2d 737, 356 N.Y.S.2d 677 (N.Y.App. 1974), *aff'd,* 36 N.Y.2d 892, 372 N.Y.S.2d 645, 334 N.E.2d 594 (1975).

Defendant also concedes that the occupation given by Plaintiff in the applications for the three policies is that of "orthopaedic surgeon," and that the policies were fully in force at the time Plaintiff resigned his positions at GCOA and Union Memorial.[4] Defendant does not question that Plaintiff is *no longer able to perform surgery* and, obviously, agrees that surgery was a principal duty of Plaintiff's former profession. Defendant further agrees that GCOA reduced Plaintiff's salary, at least in part, due to that inability.

■ Where the parties diverge is on the issue as to whether surgery is the *only* principal duty of an orthopaedic surgeon. To Plaintiff, it is, and Plaintiff contends that all of his other duties were only "incidental" to his surgery responsibilities.

Pl.'s Motion at 19. Plaintiff also argues in the alternative that, even were some of these other duties "principal" duties of his former occupation, under the "substantial performance" test, he would still be considered totally disabled so long as he "cannot perform *all* the substantial and material acts necessary to the performance of his former occupation in the customary and normal way he worked." Pl.'s Mot. at 19–20 (emphasis in original).

Defendant, in contrast, considers Plaintiff's non-operative clinical and teaching duties as "major, important, substantial, material, and principal duties which Dr. Yahiro performed until the day he voluntarily resigned from GCOA." Def.'s Mot. at 2. Under Defendant's view, one is totally disabled only if he is unable to perform any of the substantial and material duties of his occupation.

The Court finds that Plaintiff's characterization of his occupational responsibilities and his construction of the insurance contracts are untenable. The Court need look no further than Plaintiff's own experience, both before and after he stopped operating, to conclude that the principal duties of an orthopaedist encompasses more than just performing surgeries. Plaintiff testified that prior to his disability, he treated patients both surgically and non-surgically. Non-surgical treatments included diagnostic tests, referrals to other specialists or physical or occupational therapy, injections, prescription of medications, casts, etc. Many of the patients that he treated never required surgery. As noted above, at the time that he first applied for disability benefits, he indicated that "surgery, operative care of patients" consumed just 25% of his time.

---

4. The parties also appear to be in agreement that Plaintiff's teaching responsibilities at Union Memorial are to be considered part of his occupation under the "his occupation" and "regular occupation" definitions in the respective policies.

After January 1997, Plaintiff continued the non-surgical treatment of patients. Plaintiff's own description of his practice, post-disability, was "orthopedic surgery, non-operative." Def.'s Exh. 9. In a correspondence with the agent of his malpractice carrier in August of 1997, Plaintiff stated that while he would no longer be performing any surgery, "I will, however, continue to practice non-operative office orthopaedics." Def. Exh. 18. Similarly, Dr. Matthews, Plaintiff's expert and the Chief of Orthopaedic Surgery at Union Memorial, in a February 2, 1998, letter to Union Memorial's Credentials Committee asking that Plaintiff be extended hospital privileges as a "non-operating orthopaedic surgeon," noted that Plaintiff could still "render consultations, provide teaching services, provide for closed treatment of fractures and dislocations, and perform office based evaluations of patients." Def.'s Exh 20.

The conclusion that the scope of principal duties for the specialty of orthopaedics is broader than just performing surgery is bolstered by the testimony of Defendant's expert, Dr. Jeffery Abend. Abend testified that he personally knew of four or five non-operating orthopaedic surgeons, and perhaps more significantly, he offered statistics from the American Academy of Orthopedic Surgeons showing that 2.45% of the members of the Academy are in full-time, non-surgical clinical practices. Defendant also submitted with its motion copies of four recent advertisements in professional journals for "non-operative orthopaedists." Def. Exh. 19. *See also, Ames v. Provident Life & Acc. Ins. Co.,* 942 F.Supp. 551, 557 (S.D.Fla.1994) (up-

holding jury verdict finding orthopaedic surgeon who could no longer operate was not totally disabled based, in part, on testimony of expert that "physician may practice medicine within the recognized specialty of orthopaedic surgery without performing surgery"), *aff'd,* 86 F.3d 1168 (11th Cir.1996).[5]

The Court acknowledges that, without the ability to do surgery, Plaintiff's position at GCOA was not as lucrative as it would have been had Plaintiff been able to continue to operate. The evidence shows, however, that during the two years that Plaintiff continued in his non-surgical practice, he was able to make a substantial income, particularly when combined with his income from his faculty position. The Court notes that Defendant made partial disability payments in recognition of Plaintiff's diminished earning capacity.

 Despite his continued ability to earn a substantial income, Plaintiff contends that his remaining at GCOA would not have been economically viable, long-term, and that he would have been terminated from his position if he had not voluntarily resigned. Even were the Court to accept that supposition, that would not necessarily lead to the conclusion that Plaintiff was totally disabled. Occupational disability policies protect against the loss of the ability to perform the principal duties of a particular occupation, not a particular position. The disability clauses in the policies at issue speak in terms of the "principal duties of [Plaintiff's] *occupation,*" not Plaintiff's position or job. "[R]egular occupation ... is not limited to the insured's particular job [but encom-

---

**5.** To bolster his position, Plaintiff cites, completely out of context, a sentence from Defendant's own Disability Benefits Guidelines which appears to indicate that the only principal duty of a surgeon is the ability to perform surgery. *See* Pl.'s Motion at 19 (quoting Exh. 33 at 3(Sealed)). This sentence, however, appears in Defendant's Guidelines in the context of a specific hypothetical example, with facts very different than presented in the case at bar.

passes] a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Blasbalg v. Massachusetts Cas. Ins. Co.*, 962 F.Supp. 362, 367 (E.D.N.Y.1997) (internal quotations omitted). There is no indication that Plaintiff ever looked for a non-surgical orthopaedist position.[6]

Given the Court's determination that the principal duties of Plaintiff's occupation include more than just the performance of surgery, and there being no claim that Plaintiff's disability precludes him from performing those other duties, the only conclusion under the terms of the policies is that Plaintiff is partially disabled. Plaintiff's alternative argument, that he is totally disabled unless he can perform *"all* the substantial and material acts necessary to the performance of his former occupation," effectively eliminates the partial disability provisions contained in the policies. The policies clearly envision that where the insured "is unable to perform one or more *but not all* of the principal duties of the regular occupation," he is not totally disabled, but partially disabled.[7] *See Giampa v. Trustmark Ins. Co.*, 73 F.Supp.2d 22 (D.Mass.1999) ("Insurance policies containing provisions for total and partial disability must be construed as a whole, so as to give effect to the entire contract."); *Dym v. Provident Life & Acc. Ins. Co.*, 19 F.Supp.2d 1147 (S.D.Cal.1998) ("A comparison of the two definitions suggests that the phrase 'you are not able to perform the substantial and material duties of your occupation' as used in the 'total disability' definition cannot reasonably be read as 'you are not able to perform one or more of the substantial and

material duties of your occupation,' because if such a reading was intended, the language 'one or more' would have been used, as it is in the 'residual disability' definition.")

In their pleadings, both parties rely heavily on the *Giampa* decision. In *Giampa*, the plaintiff insured was a chiropractor. Prior to his injury, plaintiff "had spent eighty-five to ninety-five percent of his time treating patients (i.e., conducting examinations and performing manipulations or adjustments) and the remainder of his time managing his two chiropractic facilities." 73 F.Supp.2d at 23. After an injury that rendered the plaintiff unable to treat patients any longer, he focused his efforts exclusively on the management of several chiropractic clinics. Those administrative duties ended up becoming considerably more lucrative than his previous practice treating patients.

The plaintiff was insured under disability policies that contained definitions of total and residual disability that are very similar to the definitions of total and partial disability in the policies at issue in this action. While the insurer initially made payments under the total disability provision, those payments were subsequently suspended. The plaintiff filed suit to have those payments restored.

The insurer in *Giampa* then moved for summary judgment on the ground that the plaintiff was not totally disabled. After discussing the interplay between the total and residual disability provisions in the policy, the Court concluded that the question as to whether the insured was partially or totally disabled turned on the determination as to whether those duties that

---

**6.** The Court notes that it might have reached a different conclusion if Plaintiff's pre-disability practices had been exclusively, or even near exclusively surgical. It was not.

**7.** It is perhaps telling that in Plaintiff's initial pleading, he does not even mention the presence of partial disability provisions in the policies.

he remained able to perform despite his disability, i.e., his management and administrative duties, were a "substantial and material part" of the insured previous employment, or merely an "incidental part" of that employment. 73 F.Supp.2d at 29. Finding that this latter determination was a question for the jury, the Court denied the defendant's motion for summary judgment.

Here, no reasonable trier of fact could conclude that Plaintiff's non-surgical treatment of patients and his teaching duties were merely incidental to his surgical treatment of patients.[8] These duties consumed a large percentage of his time and directly generated a significant portion of his income. Those duties, by any measure represented a substantial and material part of his pre-disability practice of orthopaedics.

For these reasons, the Court finds that, while undeniably partially disabled within the meaning of the policies at issue, Plaintiff is not totally disabled. Accordingly, Defendant is entitled to summary judgment. A separate order consistent with this Memorandum will issue.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this day of February, 2001 by the United States District Court for the District of Maryland, ORDERED:

1. That Plaintiff's Motion to Seal Exhibit 33, Paper No. 19, and Defendant's Motion to Seal Exhibit 23, Paper No. 23, are GRANTED and that the referenced exhibits shall remain under seal pending the completion of these proceedings or any appeal thereof, at which time the Clerk of Court shall destroy said exhibits;

2. That Plaintiff's Motion for Partial Summary Judgment, Paper No. 20, is DENIED;

3. That Defendant's Motion for Summary Judgment, Paper no. 22, is GRANTED;

4. That judgment in entered in favor of Defendant and against Plaintiff;

5. That any and all prior rulings made by this Court disposing of any claims against any parties are incorporated by reference herein and this order shall be deemed to be a final judgment within the meaning of Fed.R.Civ.P. 58;

6. That this case is hereby CLOSED; and

7. That the Clerk of the Court shall mail or transmit copies of the foregoing Memorandum and this Order to all counsel of record.

---

**8.** Although Plaintiff originally pled a jury trial, the parties subsequently agreed to have the case tried non-jury. Thus, were the case to have gone to trial, the Court would have been the factfinder, rendering its findings of fact on much the same evidence presented in these cross-motions.