Michael **BRUMER**, Plaintiff,

v.

**NATIONAL LIFE OF VERMONT**, Paul Revere Life Insurance Co., and Provident Life and Accident Insurance Company, Defendants.

No. CV–91–2113 (DGT).

United States District Court,
E.D. New York.

Sept. 22, 1995.

Harold Skovronsky, Brooklyn, NY, for plaintiff.

Evan L. Gordon, Lane & Mittendorf, New York City, for defendants.

### MEMORANDUM AND ORDER

TRAGER, District Judge.

On February 14, 1995, plaintiff filed a Notice of Motion for reargument and reconsideration of this Court's Order of January 23, 1995, which granted summary judgment to the defendants. The Court had denied the plaintiff's claim for disability insurance because of the undisputed testimony that Dr. Brumer was not performing podiatric surgery for at least thirteen months prior to January 26, 1991, the date claimed as the onset of his disability. And, therefore, he was not performing podiatric surgery "at the time [his] disability began," the standard set forth in his disability policy. However, in an affidavit accompanying the motion to reargue, Brumer now claims that he performed at least three surgeries in the six weeks prior to filing his disability claim. Pl.'s Aff. at ¶ 3.

### Background

Plaintiff, Dr. Brumer, was engaged in practicing podiatric medicine from 1975 until 1989. Over the course of this period, he purchased three long-term disability insurance policies from the defendants. Also, sometime in 1988, plaintiff organized a group of podiatric clinics in which a number of other podiatrists are employed. In 1989, the New York State Board of Regents suspended him from practicing for eleven months starting December 25, 1989.

Prior to this motion for reargument, the record established that the condition of Dr. Brumer's eyesight was as follows. In November 1990, during his suspension period, a "black spot" in his left eye developed due to a condition known as "central serous retinopathy." Pl.'s 3(g) Stat. at ¶ 7. The black spot gradually improved; however, due to scar tissue, distorted vision slowly developed. According to plaintiff's deposition taken on July 14, 1992, "[w]hen the blind spot did resolve there was a period of time, maybe two weeks, that my vision was a lot better, where I

*might* have been able to perform surgery." (Emphasis added.) Brumer Dep. at 75. In his affidavit, dated February 14, 1995, in support of his motion for reargument, Brumer now maintains that "in December 1990 and January 1991 I certainly had regained good visual acuity." Pl.'s Aff. at ¶ 3.

Aside from the status of his eyesight, there is now a more significant contradiction between the plaintiff's deposition and his present posture. This relates to whether or not he performed any surgery during the eight week period between his reinstatement in late November, when he could again legally perform podiatric surgery, and January 26, 1991, when Brumer filed his disability claim. Until now, plaintiff has claimed that because of his visual impairment he did not perform podiatric surgery. Brumer Dep. at 71–74.

On numerous occasions in Brumer's deposition, he denied performing surgery between November 25, 1990 and January 26, 1991. *See* Brumer Dep. at 59, 71–75, 100, 142, 143. Thus, at one point in his account, he stated: "I didn't perform any podiatric surgery in, say, the month of December of 1990." Brumer Dep. at 75. More significantly, in his deposition, Brumer was asked whether after the suspension he had resumed the practice of podiatric surgery. His response was: "I did see patients and I appointed them for surgery in March. And I was hoping that at that time [my visual impairment] would be resolved." Brumer Dep. at 72. The clear import of this statement is that Brumer was completely incapable of practicing surgery in December 1990 and January 1991, but was hoping to be in a position to do so in March. Similarly, he responded to another question about his performance after his suspension saying: "I was seeing patients and there were no surgeries to be performed." Brumer Dep. at 67.

After the Court granted summary judgment, attached with plaintiff's motion for reargument was his affidavit which stated, "I had in reality performed no fewer than three surgeries at this time." Pl.'s Aff. at ¶ 3. The proof that he presents to support this claim are three operative reports, dated December 15, 1990, January 7, 1991, and January 10, 1991. These reports detail the opera-

tion performed but do not clearly state the attending physician's name. There is simply an undecipherable, scribbled signature in the space for the attending physician to sign. Presumably, the signature of the attending physician is his. According to the affidavit, since Brumer was "substitut[ing]" for another podiatrist, the insurance billings for those procedures were not in his name. Pl.'s Aff. at ¶ 3.

### Discussion

#### (1)

■ Even if a fact-finder were to accept this "new" evidence as consistent with the truth, Brumer would still as a matter of law not be entitled to recover. Performing a minimal number of surgeries as a "substitute" for another doctor does not establish that surgery constituted a "material and substantial" part of his responsibilities at the time he became disabled—the standard required under the disability policy. *Dixon v. Pacific Mut. Life Ins. Co.*, 268 F.2d 812 (2d Cir.1959), *cert. denied*, 361 U.S. 948, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960) (applying New York law, the Court found that a disability policy which insured a doctor against the inability to practice as a "physician and a surgeon," and who for almost twenty years prior to the onset of his disability was solely practicing surgery was disabled even though he still could practice as a physician); *Niccoli v. Monarch Life Ins. Co.*, 70 Misc.2d 147, 332 N.Y.S.2d 803 (1974), *aff'd*, 45 A.D.2d 737, 356 N.Y.S.2d 677 (1974), *aff'd*, 36 N.Y.2d 892, 372 N.Y.S.2d 645, 334 N.E.2d 594 (1975) (finding that because plaintiff's occupation prior to his heart attack was solely performing the tasks of an OB/GYN physician, the fact that after his heart attack he worked as the director of a family planning clinic which had some but not a "substantial part of the ordinary duties of his former occupation" did not bar him from collecting his disability insurance). In anticipation of this obvious point, in his affidavit, Brumer claims that the paucity of surgeries was not unusual because of two factors.

First, elective surgery is generally postponed in the winter due to bad weather conditions. Pl.'s Aff. at ¶¶ 4 & 5. In addi-

tion to his deposition testimony that he did not perform surgery during December 1990 and January 1991 because of his vision problems, Brumer Dep. at 67–75, there is little reason to credit Brumer's new explanation. Brumer did not provide either his own prior records for the many years he was in active practice or that of his employees to show that three surgeries in one month in the winter would not be unusual. Moreover, he has offered no general statistical analysis demonstrating such a severe decline in podiatric surgery in winter months.

Second, Brumer explains that he only performed three surgeries because he was just re-establishing his practice "while I was re-building my patient load in December–January, there were virtually no surgical opportunities for me," Pl.'s Aff. at ¶ 6, and I "did not have a pool of patients of [my] own." *Id.* Again, these claims not only contradict his deposition, but also lack sufficient credible factual support. It is difficult to accept the argument that the owner of a large podiatric practice who, prior to his suspension, "performed eighty to ninety percent of the bone surgical procedures in the offices," Brumer Dep. at 21, would have had any difficulty in obtaining his former or at least new patients.[1]

In sum, Brumer's attempt to show that his eye problem did not account for his non-existent or minimal surgical practice is spurious. In any case, his claim that he was engaged in the active practice of podiatric surgery in the eight weeks before he filed his disability claim is without merit.

### (2)

■ Regardless of the credibility or sufficiency of plaintiff's new version of events, the law is clear that an affidavit, such as Brumer's, contradicting critical, prior testimony should be disregarded. *Trans–Orient Marine v. Star Trading & Marine*, 925 F.2d 566, 572 (2nd Cir.1991). In *Trans–Orient*, the plaintiff, a shipping agent delivering agricultural products to Sudan, submitted an affidavit after the trial which conflicted with his

trial testimony. The Court held that there was no "factual issue. The rule is well settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Id.* at 572.

In *Mack v. U.S.*, 814 F.2d 120 (2nd Cir. 1987), the appellant's deposition unequivocally stated that he had consented to a urinalysis. However, after the deposition and after the appellees moved for summary judgment, appellant submitted a contrary affidavit. The Court held that "[i]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." *Id.* at 124.

Similarly, in an age discrimination suit, the Second Circuit found that deposition testimony regarding the date the cause of action arose, the date he was notified of his discharge, could not be disavowed by later testimony "for the purpose of creating an issue of fact." *Miller v. International Telephone and Telegraph Corp.*, 755 F.2d 20, 24 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). *See also Reisner v. General Motors Corp.*, 671 F.2d 91, 93 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982) (disregarding factual claims made by the plaintiff after the defendant moved for summary judgment "where those claims contradict statements made previously by [the plaintiff] at his deposition . . ."); *Perma Research and Development Co v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.")

Brumer was explicitly asked no less than eight times in his deposition whether he performed surgery in December 1990 or January 1991, and he consistently answered that

---

**1.** It would seem that if there were any merit to these explanations, Brumer would have provided the Court with information on the number of surgeries that Dr. Klein, Brumer's partner, performed immediately after Klein's license was reinstated in November 1990. After all, Klein should have experienced the same patient decline in procedures for the same two reasons.

he did not perform surgery during that period. Now, however, his affidavit claims that he was "under pressure and confusion of a lengthy and aggressive examination before trial" and after reviewing his records, he has discovered that "I had in reality performed no fewer than three surgeries at that time." Pl.'s Aff. at ¶ 3. The determination of whether Brumer performed surgery in December 1990 and January 1991 was no tangential issue. It was certainly *a,* if not *the,* critical issue, and his deposition was taken only a year and a half after these newly discovered surgeries. Further, this new evidence also conflicts with that portion of his deposition where he stated that there was only a two week time span in which he could have performed surgery. Brumer Dep. at 75. Apparently, now this is not the case.

■ In sum, the law is clear that "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine v. Star Trading & Marine, supra,* 925 F.2d at 572. Plaintiff's attempt at this late date to walk away from his prior testimony on the critical issues should not and will not be countenanced.

### Conclusion

Accordingly, Brumer's motion for reargument and reconsideration of the Court's Order of January 23, 1995, being both factually and legally insufficient, is denied.

SO ORDERED.