**Lawrence KLEIN, Plaintiff,**

v.

**NATIONAL LIFE OF VERMONT, Berkshire Life Insurance Co., and Massachusetts Casualty Insurance Co., Defendants**

No. 94–CIV–0181 (DGT).

United States District Court,
E.D. New York.

June 3, 1998.

Harold Skovronsky, Brooklyn, NY, for Plaintiff Lawrence Klein.

Evan L. Gordon, Banger, Klein, Rocca & Blum, New York City, for Defendant National Life of Vermont.

George Berger, Phillips Nizer Benjamin Krim & Ballon, LLP, New York City, for Defendant Berkshire Life Insurance Company.

Michael Yoeli, Assail & Yoeli, LLP, New York City, for Defendant Massachusetts Casualty Insurance Company.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

Plaintiff, Lawrence Klein, purchased disability insurance policies from three different

insurers, National Life of Vermont ("NLV"), Berkshire Life Insurance Co. ("BLI"), and Massachusetts Casualty Insurance Co. ("MCI") (collectively "the companies"). The occupational disability policies purchased from the companies provide for benefits to be paid in the event that Klein should become totally disabled.

On November 1, 1985, Klein purchased a total disability insurance policy from NLV. *See* Def. 3(g) Stat., ¶ 1. At the time he purchased the NLV insurance policy, Klein described his "current occupation" as that of a "[p]odiatrist," and listed his job duties as "[p]odiatric [s]urgery." Total disability is defined in the NLV policy as an inability of the insured "to perform the material and substantial duties" of his "occupation ... at the time such disability begins." Def. 3(g) Stat., ¶ 2. The term "[o]ccupation" is undefined in the policy. *See Id.*

On or about January 1, 1991, Klein bought a total disability policy from MCI. *See* Def. 3(g) Stat., ¶ 7. At the time he purchased the MCI insurance policy, Klein described his "[o]ccupation" as "[p]odiatrist," and stated that his "[e]xact duties" consisted of "[p]odiatric [s]urgery" at which he spent "90%" of his time. Total disability is defined in the MCI policy as the insured's "substantial inability to perform the material duties of your work ...." Def. 3(g) Stat., ¶ 8. In that policy, "[w]ork" is defined as "your regular occupation, trade or profession ... as such exists at the start of any period of disability ...." *Id.*

Six months later, on or about July 9, 1991, Klein purchased an additional total disability policy from BLI. *See* Def. 3(g) Stat., ¶ 4. At the time he purchased the BLI insurance policy, Klein gave his job title as "[p]odiatric [s]urgeon." The only description he gave of his job duties was "[p]odiatric [s]urgery [p]ractice [m]anagement." Total disability is defined in the BLI policy as the inability of the insured "to perform the material and substantial duties of your occupation." Def. 3(g) Stat., ¶ 5. As with the NLV policy,

"[o]ccupation" is undefined in that policy. As with the other two policies, the critical time for determining what is a claimant's occupation is the period "immediately preceding the onset of disability." *Id.*

Plaintiff filed this action after all three companies contested his claims for benefits on the grounds that "in addition to his occupation as a podiatrist/podiatric surgeon, Dr. Klein had and still has a separate occupation as an administrator/manager of a number of podiatric clinics." Def. Let. dated 12/17/96 (joined in by all three defendants). Following discovery, defendants moved for summary judgment. Their motion is granted for the following reasons. Klein's "occupation" or "work," which absorbed most of his time and efforts and which he was and is fully able to carry out, was the operation, administration and management of a number of podiatric clinics. At the time Klein became disabled, his podiatric surgery practice consumed, at most, a minor portion of his time and constituted an insubstantial portion of his responsibilities. Moreover, plaintiff was then deriving and continues to derive the overwhelming bulk of his income from his management of six podiatric clinics.

## Background

### (1)

Klein started working in the field of podiatric medicine in 1975. Beginning in 1981, plaintiff, together with his partner, Michael Brumer, organized a group of podiatric clinics in which a number of other podiatric surgeons were employed. *See* Klein tr., pp. 11, 19, 22–23, 26, 44. In time, income from this growing number of clinics came to represent the overwhelming source of plaintiff's income.[1] Thus, in 1991, while Klein reported wages and salary of $54,000, he reported $545,400 under miscellaneous income. Moreover, the gross billings attributable to the 291 surgeries and surgically related procedures that Klein performed in 1991 as the

---

1. In 1989, however, the Commissioner of the New York State Board of Regents charged Klein and his partner Brumer with a number of offenses including practicing fraudulent and unnecessary surgery, ordering excessive tests, committing insurance fraud, and misleading the public through deceptive advertising. The charges were sustained and Klein was suspended from the practice of podiatric medicine for eleven months. *See In the Matter of Klein*, 167 A.D.2d 625, 562 N.Y.S.2d 856 (3d Dep't.1990). In 1990, he resumed all aspects of his practice.

primary surgeon amounted to roughly $85,-000. *See* Smith Reply Aff., ¶ 2. In 1992, Klein reported wages and salary of $52,000, while reporting miscellaneous income of $791,500. However, the gross billings attributable to the 167 surgeries and surgically related procedures that Klein performed as the primary surgeon in 1992 amounted to roughly $55,000. *See Id.;* Pl. Let. dated 9/24/97 (confirming accuracy and veracity of Smith reply affidavit).[2] Similarly, in 1993, the year when Klein filed for total disability insurance, he claimed salary in the amount of $52,000, while he reported $656,600 under miscellaneous income. From January to May 1993, the gross billings for the 84 procedures Klein performed as the primary surgeon amounted to $14,000. *See* Smith Sup. Aff., ¶ 4; Pl. Let. dated 9/24/97.

In each of these years, the income listed on line 22 of Klein's 1040 tax returns under "miscellaneous income" was detailed in an attached "schedule" or "statement." These schedules listed Klein's clinics, including those clinics in which Klein did not practice podiatric surgery, as the sources of Klein's miscellaneous income. The overwhelming portion of Klein's miscellaneous income was derived from the clinics at which he did not perform any surgery whatsoever. For instance, in 1992, out of the $791,500 listed on Klein's 1040 tax return as miscellaneous income, only $302,000 was derived from Fulton Footcare, the clinic at which Klein practiced surgery, while the rest, $489,500, was derived from Klein's other clinics.

Although Klein stated both in his deposition and in his affidavit in opposition to defendants' summary judgment motion that he spent his time "almost entirely" on surgery

and patient care, the evidence is that in 1992 Klein performed only 167 surgical and surgically related procedures as the primary surgeon, while in 1993 from January through May, Klein performed only 84 procedures.[3] *See* Smith Aff., ¶¶ 2, 3; Pl. Let. dated 9/24/97. In addition, Klein claims to have assisted in 216 surgeries in 1991, 202 surgeries in 1992, and 141 surgeries through May of 1993.[4] Smith Aff., ¶¶ 2, 3. There is, however, no indication in Klein's charts, or anywhere else in the record, that Klein billed any patient for assisting in surgery during the period in question. Moreover, Klein's office did not bill insurance companies for the time he spent assisting other surgeons because most do not pay for assisted surgeries. *See* Klein tr., pp. 210–11.[5]

Klein concedes that he engaged in podiatric office management activities, such as hiring and firing, dealing occasionally with insurance companies, and maintaining supervision of those offices. *See* Klein tr., pp. 140–41, 152, 163; Klein Aff., ¶ 9. Klein estimated that in 1992, 5% of his time was devoted to making personnel decisions. *See* Klein tr., p. 145. Klein spoke with podiatrists hired as independent contractors at least twice a week regarding business matters. *See* Klein tr., p. 152. Plaintiff's duties with respect to his clinics also included interviewing podiatrists for positions in the various clinics and involvement in all decisions concerning the hiring and firing of podiatrists. *See* Klein tr., pp. 135, 140–41. He made decisions regarding the placement of podiatrists within the various clinics, as well as matters involving the nonprofessional personnel. *See* Klein tr., pp. 147, 141. For instance, doctors at the other clinics needed

2. In all material respects, the numbers set forth in the Smith affidavits are consistent with the schedules later produced by Klein.

3. Although Klein stopped performing podiatric surgery in August 1993, the number of surgeries Klein performed in June, July and August of that year diminished as Klein's illness worsened. *See generally* tr. dated 7/24/97. In fairness, therefore, Klein's surgical records for those months would not reflect the true nature and extent of Klein's surgical practice preceding the onset of his alleged disability and should not be considered.

4. Klein's charts state that he assisted on 493 separate surgeries from January 1992 to May 1993, a difference of approximately 150 surgical procedures. Klein's charts, however, are not supported by the records provided by Klein to the defendants' accounting firm. No other records of assisted surgeries have been provided by Klein in this matter.

5. There are insurance companies that pay 10% or 20% of a surgeon's fee to a podiatric surgeon who assists in certain procedures relating to bunions, fibromas and ganglions. *See* Klein tr., 210–211.

Klein's authorization to hire office managers. *See* Klein tr., p. 149.

Furthermore, the principal decision-maker regarding expenditures at his satellite clinics was Klein, and he, along with his partner Brumer, had final authority on matters concerning insurance, accounting, and the leasing of equipment. *See* Klein tr., p. 163. Klein was also involved in decisions concerning expenditures at each of the various facilities. *See* Klein tr., p. 149. He spoke to doctors at other clinics on a regular basis regarding productivity and management of the offices. *See* Klein tr., p. 152.

Camille Levin, the office manager of the Brooklyn clinic, reported directly to Klein. Ms. Levin discussed problems directly with Klein, and he would from time to time take charge when a situation became "difficult." *See* Levin Aff., ¶ 4. Prior to his claimed disability, plaintiff admits to having spent at least one hour per day overseeing collections, reviewing computer reports, *see* Klein tr., p. 349, and discussing accounts receivable matters with Ms. Levin. *See Id.* at 153.

(2)

In August 1993, a medical disorder affecting plaintiff's left hand—a painful, arthritis-related condition of the thumb—made it impossible for plaintiff to perform podiatric surgery. In or about August 1993, Klein filed claims for total disability benefits with VLI, BLI and MCI. The companies declined coverage.

Following the onset of his disability, plaintiff has continued to manage his several clinics and further expanded his business by opening a clinic in the Bronx the year after he stopped performing surgery. *See* Klein tr., pp. 93–94. According to Klein, he has continued to spend at least 10–15 hours per week, and as much as 3–4 hours per day in his downtown Brooklyn clinic. *See* Klein tr., pp. 155–56. Klein spends his time at the Brooklyn clinic overseeing the collection functions for all of the clinics and is the only person responsible for doing so. *See* Klein tr., pp. 345–46. In 1994 and 1995, during which time plaintiff could not engage in the practice of podiatric surgery because of his disabled left thumb, he reported incomes of $491,578 and $600,685, respectively, from his podiatric clinics, or miscellaneous income, as compared with $791,500 in 1992 and $656,600 in 1993.

(3)

Defendants denied plaintiff's claim that he had become totally disabled on the ground that the policies require that plaintiff be totally disabled from performing his work or occupation "at the time" his claimed disability began. Defendants contend that in addition to Klein's practice of podiatric surgery—which defendants concede he can no longer perform—he was engaged in another separate occupation as the owner, operator, manager and administrator of a number of podiatric clinics, and that viewing the facts in a light most favorably to the plaintiff, his continued operation, administration, and management of these clinics after the onset of his alleged disability in August 1993 rendered him, as a matter of law, not totally disabled as defined in the three disability income policies. *See* Def. Mem. dated 3/13/97, p. 2. Plaintiff's response is that his "managerial activities ... consumed only a small fraction of [his] working time" and should be viewed as "peripheral" to what he claims to be his real occupation, namely podiatric surgery. *See* Klein Aff., ¶ 9.

**Discussion**

(1)

■ As this is a diversity action, the substantive law of New York must be applied. *See GNOC, Corp. v. Endico,* 876 F.2d 1076, 1078 (2d Cir.1989). Under New York law, the burden of proving total disability within the meaning of the insurance policy falls upon the claimant. *See Goell v. United States Life Ins. Co.,* 269 A.D. 573, 55 N.Y.S.2d 732, 733 (1st Dept.1945) (per curiam); *Berkowitz v. Metropolitan Life Ins. Co.,* 180 Misc. 757, 43 N.Y.S.2d 176, 177 (1st Dept.1943) (per curiam) (refusal to charge jury that "plaintiff had the burden of furnishing due proof of continuance of total and permanent disability" was prejudicial error). Thus, for plaintiff to prevail, he must establish that a reasonable jury could find that he has become "totally disabled" from continuing to perform the occupation that he was

engaged in prior to the onset of his disabling arthritic condition within the meaning of the insurance policies at issue. *See* Def. 3(g) Stat., ¶¶ 2, 5, 8.

New York courts have consistently held that a claimant is "totally disabled" when he or she is no longer able to perform the "material" and "substantial" responsibilities of his or her job. *See McGrail v. Equitable Life Assurance Society,* 292 N.Y. 419, 425–26, 55 N.E.2d 483 (1944); *Matza v. Empire State Mut. Life Ins. Co.,* 50 A.D.2d 554, 555, 375 N.Y.S.2d 578, 581 (1st Dept.1975); *Leibowitz v. Mutual of Omaha Ins. Co.,* 71 Misc.2d 838, 839, 337 N.Y.S.2d 314, 316 (Civ. Ct.N.Y.Co.1972); *Niccoli v. Monarch Life Ins. Co.,* 70 Misc.2d 147, 332 N.Y.S.2d 803 (Sup.Ct. Kings Co.1972), *aff'd.,* 45 A.D.2d 737, 356 N.Y.S.2d 677 (1974) *aff'd,* 36 N.Y.2d 892, 372 N.Y.S.2d 645, 334 N.E.2d 594 (1975); *George v. First Unum Life Ins. Co.,* 1996 WL 701018, 2 (S.D.N.Y.1996); *see also Franklin Life Ins. Co. v. Burgess,* 219 Ark. 834, 245 S.W.2d 210, 214 (1952) (involving similar standard); *Pacific Mut. Life Ins. Co. v. McCrary,* 161 Tenn. 389, 32 S.W.2d 1052 (1930) (same); *see generally* E.L. Kellet, Annotation, *Insurance: "Total Disability,"* 21 A.L.R.3d 1155 (1968). At least two of the policies at issue explicitly incorporate this legal standard by providing that to be considered totally disabled, an insured must be unable to perform the "material" and "substantial" duties of the insured's occupation. *See* Def. 3(g) Stat., ¶¶ 2, 5, 8.

Cases involving New York law that have interpreted the term "occupation" have engaged in a fact-oriented, functional approach that looked to the professional activities in which the insured was regularly engaged at the time of the onset of the insured's disability. If a claimant is able to perform the duties of a "position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties," he is not totally disabled. *Blasbalg v. Massachusetts Cas. Ins.*

*Co.,* 962 F.Supp. 362, 367 (E.D.N.Y.1997) (internal quotation marks omitted); *see also Dawes v. First Unum Life Ins. Co.,* 851 F.Supp. 118, 122 (S.D.N.Y.1994).[6]

### (2)

The issue here, then, is the nature of Klein's "occupation" or "work" at the time of the onset of his disability. As discussed below, the record is clear that in early 1993 plaintiff was predominantly engaged in operating and managing his podiatric clinics while practicing, at most, a minimal amount of podiatric surgery. Whether Klein's activities running the podiatric clinics are characterized as a separate occupation or as part of a single occupation does not alter the picture. Either way, the record leaves no room for doubt—Klein was no passive investor in six podiatric clinics, but was engaged in the "substantial" and "material" business of operating, administering and managing these clinics which generated high six figure incomes. Nor can this income be attributed to the paltry revenues generated by the surgeries that Klein performed himself and which took only a small portion of his time and constituted a minor portion of his duties as well as income.

As the following cases make clear, both the claimant who is not disabled from performing the "substantial" and "material" responsibilities of a sole occupation at the time of his disability and the claimant who is not disabled from engaging in one of several separate and distinct occupations are barred from recovering total disability benefits. It, therefore, does not really matter whether Klein's occupation is considered to consist of two separate professions—one of which he can continue to do—or one profession with separate aspects. The disability benefits analysis is the same. For as long as podiatric surgery did not constitute a "material" and "substantial" part of Klein's profession at the time he became disabled, he was not

---

6. "Occupation" has also been defined to mean "the principal business of one's life: a craft, trade, professional or other means of earning a living: employment, vocation." *DiTommaso v. Union Cent. Life Ins. Co.,* 1991 WL 124601, 3 (E.D.Pa.), *aff'd,* 972 F.2d 1330 (3d Cir.1992) (quoting Webster's Third New International Dictionary (1986)). Regular means "steady or uniform in course, practice, or occurrence." *Id.* As the *DiTommaso* court held, "one's regular occupation is the business, trade or profession one engages in on a usual basis." *Id.*

then "totally disabled" within the meaning of the policies.

New York cases indicate that management of a health care facility by a health care professional may well constitute an occupation separate and apart from that of the health care practitioner. *See Niccoli v. Monarch Life Ins. Co.*, 70 Misc.2d 147, 332 N.Y.S.2d 803 (Sup.Ct. Kings Co.1972). In *Niccoli*, the New York Court of Appeals upheld a finding of total disability for an OB/GYN physician who was *later* employed as the director of a family planning clinic. The jury's finding that the plaintiff was totally disabled from performing the duties of his occupation (at the time of the onset of his disability) after suffering a heart attack was sustained notwithstanding the fact that as the clinic's director, he performed some of the same tasks an OB/GYN physician would perform at a salary comparable to that which he had earned prior to the onset of his illness. Management of the family planning clinic was considered a new occupation distinct from that of an OB/GYN physician because his responsibilities at the clinic did not involve "any substantial part" of the "ordinary duties" of his former occupation. *See Niccoli v. Monarch Life Ins. Co.*, 332 N.Y.S.2d at 806, 808.

In *Brotman v. National Life Insurance Co.*, 1997 WL 442173 (E.D.N.Y.), a podiatrist owned several podiatric clinics, practiced podiatric surgery, supervised podiatrists he employed, and handled administrative matters such as billing, advertising and payment of expenses. By his own admission, he was both a surgeon and the owner and manager of podiatric clinics. Without explanation, Dr. Brotman closed all but one of his clinics during the spring and summer of 1993. He then developed a benign familial tremor of both hands which allegedly rendered him unable to perform surgery. In October 1993, Dr. Brotman stopped practicing podiatric surgery, and he closed his remaining clinic one month later. On plaintiff's motion for summary judgment, the court refused to find that Dr. Brotman was totally disabled from his occupation. The court held that "[i]f the Plaintiff had more than one occupation and was still qualified to perform any one, the Plaintiff did not have a total disability, and is not entitled to payments from Defendant." *Id.* at 2 (citing *Brumer v. National Life of Vermont*, 874 F.Supp. 60, 64 (E.D.N.Y.1995), *aff'd in an unpublished opinion*, 133 F.3d 906 (2d Cir.1998)). These cases indicate that management of a health care facility may well constitute an occupation separate and apart from that of a practitioner of medicine or surgery. *See also Brumer*, 874 F.Supp. at 64.[7]

Other courts that have considered the question of single or multiple occupations vis-a-vis total disability benefits have come to the same conclusion as New York's courts. For example, in *DiTommaso v. Union Central Life Insurance Co.*, 1991 WL 124601 (E.D.Pa.), an osteopath whose duties included "general medicine, surgery and manipulations" was considered to have been working in a single occupation, and was found not to be disabled from that occupation after he permanently injured the index finger of his left hand even though he was unable to perform surgery. The *DiTommaso* court reasoned that to determine a claimant's occupation at the time of a disability's onset, it is necessary to ascertain how the claimant was earning his "primary living" at the applicable time. *See DiTommaso*, 1991 WL 124601 at 3. The *DiTommaso* court found that the claimant's performance of minor surgery that

---

7. In *Bravato v. Berkshire Life Insurance Co.*, 69 N.Y.2d 916, 516 N.Y.S.2d 628, 509 N.E.2d 323 (1987), cited by plaintiff, Bravato, who had been convicted of Medicaid fraud, recovered his license to practice chiropractic medicine shortly before he was injured in a boiler explosion while working as a real estate agent. Bravato asserted that at the time he was injured, he was attempting to rebuild his chiropractic practice. The trial court, over defense counsel's objection, had charged the jury that at the time of the disabling accident, Bravato was a chiropractor as a matter of law. The Court of Appeals reversed, holding that there was an open question concerning whether Bravato had dropped his chiropractic practice and become a full-time real estate agent at the time he became disabled. If so, the trial court erred in finding for plaintiff as a matter of law. Klein's situation is wholly distinct. As discussed above, here, there is no open question that, at the time of the onset of Klein's disability, podiatric surgery was no longer a substantial and material part of his occupation.

constituted, at most, 15% of his practice, was peripheral to his other functions and, accordingly, classified him as a physician. Similarly, as will become clear shortly, less than 15% of plaintiff's time was spent on, and even less of his income was derived from, podiatric surgery.

In *Aetna Life Insurance Company v. Orr*, 205 Ark. 566, 169 S.W.2d 651 (1943), an internist who practiced both internal medicine and surgery was considered to be engaged in two distinct occupations, those of a physician and a surgeon. In that case, the plaintiff had suffered a disabling x-ray burn to the thumb and several fingers of his right hand and could no longer practice surgery. He continued, however, to treat hundreds of patients and issue hundreds of prescriptions as a physician. The court held that to recover total disability benefits, a claimant engaged in multiple occupations "must be disabled as to both occupations." *Id.* at 655.

In *Dixon v. Pacific Mutual Life Insurance Co.*, 268 F.2d 812, 813–15 (2d Cir.1959), *cert. denied*, 361 U.S. 948, 80 S.Ct. 403, 4 L.Ed.2d 381 (1960), the Second Circuit, interpreting Arkansas law, held that a claimant who purchased an occupational disability policy that described his occupation as that of a "[p]hysician and [s]urgeon," but who for many years prior to the onset of his disability had exclusively engaged in practicing surgery, was totally disabled within the meaning of the policy, though he retained a residual capacity to practice as a physician. The claimant in *Dixon* had become a specialist in surgery by devoting himself exclusively to the practice of surgery for almost two decades, and his practice of surgery had become a separate occupation distinct from the general practice of medicine. *See Id.* at 815. This case points to the fact that the relevant test for assessing a claimant's occupation is the nature of the work actually being performed. Though Dixon was a physician, he was exclusively practicing surgery. Klein, though qualified to be a podiatric surgeon, was in fact conducting a different occupation.

Applying these precedents to the instant facts the following conclusions emerge. Whether viewed from the perspective of either how plaintiff was earning his living at the time of the onset of his alleged disability or how he actually spent his working time, there can be no dispute that virtually all of plaintiff's income resulted from the various clinics which he actively operated and administered, not from his work as a podiatric surgeon. Rather than being "peripheral or incidental," *Brumer*, 874 F.Supp. at 64, the activities related to the operation, administration and management of the various clinics were not only the main source of plaintiff's income, but also his principal activity.

(3)

Turning first to the question of income, in 1992, the year before his alleged disability, for instance, plaintiff earned $761,500.00 in distributions of "miscellaneous income" generated by his clinics, but only billed slightly more than $55,000 for surgical and surgically related procedures. Even if his individual billing for surgical procedures at Fulton Footcare, the only facility in which plaintiff actually practiced podiatric medicine, were counted as part of the income he received from the clinics, it would amount to less than 8% of his total income. Similarly, in 1993, the year Klein filed for disability, his tax return shows miscellaneous income from the clinics of $656,600.00. Of that amount, only a total of $77,843.00 was attributable to Fulton Footcare. The total amount billed by plaintiff in 1993 for surgical and surgically related procedures was a paltry $13,995.00, about 18% of the income attributable to Fulton Footcare, and about 2% of the income he received from all of the clinics combined. Furthermore, that plaintiff's ability to earn this income was completely independent of his work as a podiatric surgeon is evidenced by the fact that in 1994 and 1995, when he was allegedly totally disabled, he earned incomes of $491,578.00 and $600,685.00, respectively, from his various clinics.

From the perspective of how Klein spent his time, it is also clear that podiatric surgery was not a substantial and material portion of his duties. In 1992, and before his disability in 1993, plaintiff performed a total of 251 podiatric surgeries as the primary surgeon, an average of roughly 17 a month. These surgical procedures took, on average, between 25 minutes and one hour to perform

or, at most, two hours for complex procedures with multiple surgical components. *See* Klein tr., pp. 254–60. At an average of roughly one hour per surgery, this amounts to approximately 17 hours per month or roughly four hours per week operating as the primary surgeon. Klein stated that he "always" worked six days per week, nine hours per day, for a total of approximately 54 hours per week. *See* Klein tr., pp. 257, 263. Out of those 54 hours, Klein spent, therefore, only 8% of his time performing podiatric surgery as the primary surgeon.

Klein claims, however, to have "assisted" in 559 podiatric surgeries from 1991 to May 1993, an average of roughly 19 a month. Still, it is clear that this work also took only a minimal amount of his time. Assuming he spent one hour assisting in each of these surgeries, this equals 19 hours per month or 4.5 hours per week spent assisting surgery, or about 8% of his time. Combining the time that Klein spent as the primary surgeon and in assisting in the performance of surgery, roughly 16% of his time was spent in the practice of podiatric surgery. Even if Klein were credited with having spent the maximum amount of time (two hours) on each and every surgery he performed as the primary surgeon, he occupied, at most, 16% of his time engaged in primary podiatric surgery or 24% if the time he spent assisting in podiatric surgery is also included.

Moreover, the procedures in which he claims to have assisted were not a podiatric necessity, but rather something that plaintiff did when he had "free time." *See* Klein tr., pp. 104, 270. Significantly, in more than half of the surgeries in which Klein assisted other surgeons, Klein assisted Dr. Jay Leff, who Klein admits was a competent surgeon who did not need his assistance. *See* Smith Supp. Aff., ¶ 9; Klein tr., pp. 104, 202–03. Thus, Klein's presence in the operating room was medically unnecessary in at least 50% of the procedures in which he assisted. *See* Smith Supp. Aff., ¶ 9.

Moreover, Klein admits that he was present at these surgeries not to perform surgery but merely to make his former patients feel "more comfortable." Klein tr., pp. 202–03.[8] Even if Klein's statement concerning the number of surgeries in which he assisted were true, his description of the reasons for his presence indicates he was not practicing podiatric surgery. Rather, it indicates that his presence was part of an effort to maximize the income from the operation and administration of his clinics.

While plaintiff claims that his managerial activities were "peripheral" and "consumed only a small fraction of [his] working time" when considered in light of the medical or surgical tasks he performed, *see* Klein Aff., ¶ 9, given the relatively small amount of time that plaintiff actually spent in the practice of podiatric surgery in the months prior to the

---

8. Klein also claims to have assisted in surgeries by Drs. Pearce, Richardson, Hull and Paul. Klein asserts that these doctors were "utterly inexperienced in surgery." According to Klein, in many of the surgeries where he is listed as the "assistant surgeon," he, in fact, actually performed all or most of the procedure while the surgeon listed as the primary surgeon "watched and learned." Pl. Supp. Aff., ¶ 2. This assertion has no basis in the record other than plaintiff's self-serving statement which is contradicted by the rest of the record including his own testimony. Of those four podiatrists, only Dr. Pearce submitted an affidavit. Nowhere does he state that he was "utterly inexperienced" and, therefore, required Klein to perform the surgery while he, the primary surgeon, "watched and learned." Although Dr. Pearce attests that he had "little surgical experience" at the time he began his employment with Klein in September of 1991, Klein has not presented any evidence explaining how Dr. Pearce, much less four podiatric surgeons, remained "utterly inexperienced" from

the dates of their employment up until the onset of Klein's disability in August of 1993. *See* Pearce Aff., ¶ 2. In the case of Dr. Pearce, for instance, Klein's assertion requires a finding that from September 1991 until August 1993, a period of nearly two years, Pearce was at all times "utterly inexperienced" in the practice of podiatric surgery. To the contrary, Klein testified that Pearce was competent to perform some surgeries by himself after only three to four months, and that he was competent to perform even complex bunionectomies after one year. *See* Klein tr., p. 271–72. Indeed, other doctors required even less time to become proficient and self-sufficient surgeons. For instance, Dr. Richardson needed only five to six months of practice before he became "qualified to do bunionectomies as well as digital procedures by himself . . . ." *See* Klein tr., p. 269. *See generally id.* at 268–74. As noted above, Klein admits that at times he assisted qualified surgeons not out of medical necessity but when he had "free time." Klein tr., p. 270.

onset of his alleged disability, this claim borders on the preposterous.

Moreover, the record also establishes that plaintiff spent most of his time in an operational relationship with the various clinics. Prior to the onset of the disability, plaintiff admittedly spent at least an hour a day in his Brooklyn headquarters overseeing collections for the various clinics. *See* Klein tr., p. 349. This involved reviewing many computer reports and comments by bill collectors. He also discussed the accounts receivable with his office manager who came to him with billing problems that she could not handle. Plaintiff's responsibility for collections continues to this day. Thus, the time Klein spent prior to his alleged disability overseeing collections, alone, is comparable to the entire time he spent on practicing podiatric surgery. Yet, as the record makes irrefutably clear, Klein's management duties extended far beyond his responsibility for overseeing collections.

In addition to his collection duties, plaintiff's responsibilities involved interviewing podiatrists, the hiring and firing of podiatrists, the placement of podiatrists within the various clinics, and the granting of authorization to hire office managers. Indeed, plaintiff concedes that in 1992 he spent 5% of his time making personnel decisions. Thus far, Klein admits to having spent at least 16% (11% for collections duties and 5% on personnel decisions) of his time on the administration, operation and management of his clinics.

Klein was also involved in decisions with respect to expenditures by each of the various facilities. *See* Klein, tr., p. 163. He spoke to doctors in other clinics on a regular basis regarding productivity and management of the offices. *See* Klein tr., p. 152. He and Brumer had final authority with respect to insurance, accounting matters and leasing of equipment. *See* Klein tr., p. 163

Moreover, it is undisputed that plaintiff's arthritic thumb in his non-dominant hand, does not prevent him from performing the collection functions, and other administrative and managerial duties which he performed for the various offices prior to the onset of his alleged disability. Nor can it be disputed

that he earned a significant amount of money from these offices which considerably exceeded the amount of money he generated through his podiatric activities. In sum, it cannot be seriously contested that at the time of the onset of his alleged disability, plaintiff effectively operated, administered and managed a number of podiatric clinics and that he continues to own, operate, administer and manage these clinics after his disability. Moreover, based on Klein's statements alone, the undisputable evidence in the record shows that the income generated from these clinics was the result of his active involvement with the clinics, and was not derived from Klein's passive ownership investment.

Finally, and quite significantly, is the fact that when Klein filled out the application for the BLI insurance policy, the most recent policy that he purchased, Klein listed as his job duties "podiatric surgery practice management." Thus, by July 1991, even Klein viewed his responsibilities as involving more than simply practicing podiatric surgery; by this date, he had become the manager of a growing podiatric practice. Accordingly, under the precedents cited above, it is clear that plaintiff continues to be engaged in an occupation in which he engaged prior to his disability, and that his continued activities and income derived from these clinics do not render him totally disabled under the terms of the respective policies, as a matter of law.

#### (4)

Despite this incontrovertible evidence, plaintiff's counsel contends that a factual dispute exists with respect to what Klein's occupation actually was, and argues that the source of Klein's income is not at issue. *See* Pl. Let. dated 9/24/97. Conveniently ignoring his own statement in July 1991 that his job duties consisted of "[p]odiatric [s]urgery [p]ractice [m]anagement," Klein argues that his occupation, "was solely podiatric surgery." Klein Aff., ¶ 8. Defendants' argument to the contrary, he contends, "is not merely wrong, it is outrageous." *Id.* Klein, however, has not offered a shred of evidence to support these contentions.

Klein, who from day one has relied on speculation and conjecture to establish his claims, was warned that he must produce supportive evidence or face dismissal of his claims. At a status conference on July 24, 1997, it was explained to his counsel that once the movant-defendants had submitted documents showing that Klein's podiatric surgical activities were insubstantial, the burden was on the plaintiff to present evidence to the contrary. *See* Status tr., p. 35. Summary judgment is warranted where "it clearly appears that the issues are not genuine, but feigned." *United National Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir.1993) (citations omitted). In response to this warning, Klein produced charts purportedly reflecting podiatric procedures that he either performed or assisted in. These charts prove conclusively that Klein's billings for podiatric surgeries in the months and years preceding the onset of his disability comprised only a small fraction—less than 3% in 1993 and less than 8% in 1992—of his total income and a very small percentage of his total time commitment.

The charts also prove something more disturbing, that sworn statements made by Klein in his affidavit identifying his profession as podiatric surgery are at best disingenuous, if not outright falsehoods. For instance, in Klein's affidavit, he attested that defendants' representation of the total dollar amount billed for surgeries he performed and those in which he assisted was "patently absurd." Klein Aff., ¶ 10(c). Klein swore in his answering affidavit that in defendants' affidavit their accountants had "either misread or misrepresented" the billing records provided to them by Klein detailing the number of surgeries that he performed and the amount that was billed for each surgery. The "fact," Klein continued, is that "billings for the surgeries which *I* performed were: in 1991, over one million dollars; in 1992, over $700,000; in 1993, through August, about $500,000." Pl. Aff., ¶ 10(c) (emphasis added). Klein expressed his readiness to produce documents to support these assertions. *See* Status tr., pp. 31, 37. Yet, when pressed to provide such evidence (Status tr., pp. 37–39, 49–51), the documents produced by Klein only prove that this claim of large sums

billed for surgeries he performed was pure fiction. As discussed above, the dollar amounts that Klein actually billed for podiatric surgeries do not even remotely begin to approach the dollar figures that he swore in his affidavit that he billed for such surgeries. Defendants' numbers were later confirmed by records that were within Klein's own possession at the time that he made these statements.

Klein also makes several attempts in his affidavit to create a material factual dispute by contradicting his own prior sworn deposition testimony. For instance, plaintiff's denial of paragraph 51 of defendant's 3(g) statement, that "plaintiff did not direct the operation of the offices," is an attempt to create an issue of fact by disavowing his prior sworn deposition testimony. *See* Pl. 56.1(c) Stat, ¶ (a). The statements, "[m]y managerial activities were peripheral and consumed only a small fraction of my working time," and "[t]he long hours I myself spent at work were devoted almost entirely to surgery and related patient care," are contradicted by Klein's own sworn deposition testimony relating to the numerous managerial responsibilities he performed and the time he spent performing them, and his own records that show the small number of surgeries performed and amount charged per surgery by Klein in the years preceding the onset of his disability. *See* Klein Aff., ¶ 9.

In a further attempt to create a factual dispute by contradicting his sworn deposition testimony, Klein argues that "[w]henever I participated in a surgical procedure, it was because the interests of the patient and the mandates of sound surgical practice dictated that I should." Klein Aff., ¶ 10(b). In fact, Klein, testified that his presence was not medically necessary in a substantial number of the surgeries in which he assisted, but that he did so only to make his patients feel more comfortable or when he had "free time." *See* Klein tr., pp. 104, 202–03, 270.

In addition, Klein, who in his sworn deposition testimony stated that his office generally does not charge for assisted surgeries, resorted to sophistry and number games in an attempt to misrepresent the nature and ex-

tent of his surgical practice. In Klein's calculations, he divided the total dollar amount that the companies alleged that he had billed for surgeries and assisted surgeries ($22,195) by the number of surgeries (84) and assisted surgeries (141) that he had allegedly performed. He then contended that the defendants' numbers compelled the conclusion that the average billing per surgery Klein performed was only $98, whereas "the charge for an average surgery is about $3,000." Klein Aff., ¶ 10(c). Perhaps plaintiff dreams of charging an average of $3,000 per surgery, but as his own records prove, yet again, Klein's numbers are again pure fiction. Including the number of assisted surgeries, which were performed free of charge, in a calculation of the average amount billed per surgery was an obvious attempt to discredit the defendants' allegations by grossly under-inflating the value of each surgery.

■ Klein can raise no genuine issue of material fact by contradicting without explanation his prior sworn testimony. *See United Nat'l Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir.1993), citing *Trans–Orient Marine Corp. v. Star Trading & Marine Inc.*, 925 F.2d 566, 572 (2d Cir.1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); *see also Brumer v. National Life of Vermont*, 899 F.Supp. 120, 122–23 (1995), *aff'd in an unpublished opinion*, 133 F.3d 906 (2d Cir.1998) (an affidavit contradicting critical prior testimony should be disregarded).

Finally, Klein failed to make a proper denial of the facts set forth in defendants' 3(g) statement. Klein denied only the facts alleged in ¶ 51 and ¶¶ 67–90 of that statement. His "denial" with respect to ¶ 67–90 of defendants' Rule 3(g) statement reads as follows:

> (b) ¶¶ 67–90: defendants' statements regarding the nature, extent, quantity, and quality of plaintiff's vocational activities are generally incomplete, misleading or incorrect. It would be burdensome to respond to every single allegation. Dr. Klein's affidavit

correctly sets forth his work activities and the revenues generated.

Rule 3(g) of the Civil Rules of the United States Courts for the Southern and Eastern Districts of New York, however, provides:

> The papers opposing a motion for summary judgment shall include a *separate,* short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party *will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.*

(Emphasis added).

There is no such separate statement accompanying Dr. Klein's papers. There is only the "denial" quoted above, which states that it is too "burdensome" for Klein to comply with the applicable rules. Because of Klein's inexcusable failure to take proper issue with the defendants' Rule 3(g) statement, a court would be justified in deeming all of the facts set forth therein to be admitted.

### Conclusion

Viewing the evidence in a light most favorably to the plaintiff, he is not entitled to receive the disability payments he claims under the three policies in question. It is clear that Klein's ownership of numerous podiatry clinics was not a passive investment. Unlike a person who invests in a publicly held stock, Klein was at the time of the onset of his disability principally engaged in the management and operation of a chain of his podiatric clinics—an activity he continued to engage in for at least the next two years. His podiatric surgical practice was, at most, a minor and insubstantial part of his work and income. Klein, therefore, has failed to raise a dispute on a genuine issue of material fact, and accordingly, defendants' motion for summary judgment is granted and the clerk of the court is directed to close the file.

SO ORDERED: